Matter of Aaron (2018 NY Slip Op 01914)





Matter of Aaron


2018 NY Slip Op 01914


Decided on March 21, 2018


Appellate Division, Second Department


Per Curiam.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on March 21, 2018
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

WILLIAM F. MASTRO, J.P.
REINALDO E. RIVERA
MARK C. DILLON
JOHN M. LEVENTHAL
ROBERT J. MILLER, JJ.


2016-12862

[*1]In the Matter of Fredric H. Aaron, admitted as Fredric Harlan Aaron, a suspended attorney. Grievance Committee for the Tenth Judicial District, petitioner; Fredric H. Aaron, respondent. (Attorney Registration No. 2307544)



The respondent was admitted to the Bar at a term of the Appellate Division of the Supreme Court in the Second Judicial Department on February 7, 1990, under the name Fredric Harlan Aaron. By order to show cause of this Court dated April 25, 2017, inter alia, the respondent was immediately suspended pursuant to Judiciary Law § 90(4)(f) based on his conviction of a serious crime, and the respondent was directed to show cause at a hearing pursuant to 22 NYCRR 1240.12(c)(2) before the Honorable Elaine Jackson Stack, as Special Referee, why a final order of suspension, censure, or disbarment should not be made based on his conviction of a serious crime.



Catherine A. Sheridan, Hauppauge, NY (Robert H. Cabble of counsel), for petitioner.
Emery Celli Brinckerhoff & Abady LLP, New York, NY (Hal R. Lieberman of counsel), for respondent.



PER CURIAM.


OPINION & ORDER
On October 14, 2016, the respondent pleaded guilty before United States Magistrate Gary R. Brown, in the United States District Court for the Eastern District of New York, to the crime of accessory after the fact, in violation of 18 USC § 3, a federal felony. The plea was accepted by order dated October 17, 2016. The respondent was sentenced on March 31, 2017, to a term of imprisonment for a period of 14 months, followed by a term of supervised release for a period of one year. In addition, he was directed to pay restitution in the amount of $456,000, along with a mandatory special assessment fee in the amount of $100.
The respondent and others were indicted in a federal criminal action arising from a multimillion dollar securities fraud. The respondent was charged with conspiracy to commit securities fraud, securities fraud, wire fraud, mail fraud, and money laundering. Pursuant to a plea agreement, the respondent agreed to plead guilty to the federal felony of accessory after the fact for his role in covering up the fraudulent scheme.
Plea 
At his plea allocution, the respondent admitted the following facts:
"[I]n approximately . . . October 2008 I was hired by an individual named Eric Aronson for legal services for companies that he controlled including an entity that had a license to distribute [inaudible] landscaping [inaudible]. At the time that I was [*2]hired for these legal services I understood that Eric Aronson had raised money for his businesses through various investors and that the investors had been issued promissory notes by which they were guaranteed property [inaudible].
"I also understood that Eric Aronson and his companies had not repaid the investors pursuant to the terms of the agreements. My role was to assist Eric Aronson and the companies in restructuring the debt so that the holders of the promissory notes would be issued [inaudible] which in turn [inaudible] converted into stock [inaudible] companies. The purpose of the debt conversion as I initially understood it was to help the companies lessen their immediate debt obligations in order for the eventual repayment of the investors.
"During my time performing legal work for Eric Aronson and his companies, various investors complained that they had been defrauded by Aronson. I originally did not give weight to these complaints because I believed there was a real product to market and sell. In approximately May of 2010 several investors in New Jersey sued Aronson and certain of his companies in order to recoup their investment. In connection with that lawsuit in approximately May of 2010, the Superior Court of New Jersey, Union County, froze the assets of certain of Eric Aronson's [inaudible]. The freeze was lifted that month pursuant to the terms of the settlement.
"Soon after the freeze was lifted Eric Aronson expressed concern to me that [inaudible] investors would sue him in New Jersey or other investors would claim [inaudible] defrauded and might seek to obtain another court order [inaudible] bank accounts of Aronson's companies. If such a freeze were to be granted, the companies would have been unable to pay their operational expenses likely leading to their collapse.
"So in or about July 2010 on Eric Aronson's behalf and as a result of a significant lapse of judgment, I allowed Eric Aronson to put a portion of the company's funds into my attorney escrow account. The understanding I had with Mr. Aronson at the time was that in the event of another freeze of the company's assets funds that were in my escrow account would be used to fund the company's continued operation despite the court order freeze. Part of my motivation for taking the corporate funds into my escrow account was to allow the companies to continue their business activities because I still believed that they had a legitimate product to sell and I hoped that Mr. Aronson would eventually be able to pay back his investors. Nonetheless, at the time I agreed to deposit these corporate funds into my escrow account I had been working on behalf of Aronson's companies for approximately a year-and-a-half on a part-time basis. Based on that work, as well as discussions with the investors, I knew at the time I took Aronson's funds into my escrow account that there was a high probability that Aronson and others had conspired to defraud investors regarding the promissory notes that had originally been issued. I also had asked [inaudible] information by which I could have determined whether or [not] the promissory notes had been issued as part of the [inaudible]. For example, I could have demanded to see all the purchase orders, confirm those orders with the customers, demanded to review bank records, interview employees and others involved with the business and the issuance of the promissory notes. However, I avoided doing these things in part because they might have confirmed [that] I was being used to further [inaudible] conspiracy to commit securities fraud. I recognize that by allowing Aronson to deposit corporate funds into my attorney escrow account so that the companies could continue to operate in the event of a freeze order there was a high probability that I was furthering an exit strategy on the part of Eric Aronson and others and that my actions were helping Aronson and others avoid repercussions, including criminal repercussions for a conspiracy in which they had engaged.
"Your Honor, I recognize [inaudible] my actions may be an accessory after the fact [*3]of the securities fraud conspiracy that involved Eric Aronson and others. I fully accept responsibility for my actions and the consequences of those actions and I am deeply sorry for any harm that I have caused and I'd like to apologize to the Court, to my wife, and to my two wonderful children, to the Government and to the company's investors.
* * *
"Prepaid attorney's fees was only part [of the ostensible reason for putting the money in the escrow account]. It was basically ostensibly in there for transactional purposes but as I understood it from my client it was being put in there for the purposes of shielding it from creditors in the event of an asset freeze. So there would be working capital available to keep the company's doors open."
Sentence 
On March 31, 2017, Judge Arthur D. Spatt of the United States District Court for the Eastern District of New York, in summarizing the facts, noted that the respondent had committed a "very bad act." The sentencing court remarked as follows:
"Between January 2009 and February 2011, a period of approximately 25 months, this defendant, knowing that a crime has been committed, namely a conspiracy to defraud the United States through the commission of securities fraud, received and released, comfort[ed] and assisted, the offender in order to hinder and prevent the offender's apprehension in violation of federal law. That's the nature of the crime he pled guilty to.
"The defendant was an attorney for the company called Permapave Industries, Inc. He was convicted of being an accessory due to his assistance of the defendant Eric Aronson in covering up or attempting to cover up the fraudulent scheme to avoid detection.
"These other persons, Mr. Aronson and company, raised money by investments secured by promissory notes. When it became apparent that the promissory notes would not be paid, the defendant, as the attorney for the company, was involved in exchanging the promissory notes for convertible debentures. And, ultimately, the defendant, on January 8, 2009, sent a letter to investors holding the promissory notes with respect to what was happening.
"But the major point here, the major bad act, very bad act, was that the defendant let Aronson use his attorney escrow account to put the money away, to deposit and withdraw investor funds to keep the scheme operating and to help Mr. Aronson, and the defendant concealed the truth about this escrow account from investors.
"Portions of [the funds] in the escrow account [were] misappropriated by the defendant Aronson. And I don't know whether any was taken by this defendant. I'm not sure about that.
"But it's very difficult in this case to ascertain how many victims were defrauded as a result of this defendant's action in this coverup. He was involved clearly in the coverup rather than commission of the crime.
"As set forth in the presentence report as revised, the defendant was the attorney who allowed Aronson to use his escrow account to deposit and withdraw funds which perpetrated the instant scheme. He worked with Aronson which resulted in a scheme where people were defrauded.
"This was an abuse of a position of public trust as he was a licensed and experienced attorney who knew that he could not use this attorney escrow account for anything like this.
"In his own statement, a written statement he provided, defendant provided to the probation officer, part of it says the following: I knew, at the time I took Aronson's funds into my escrow account, that there was a high probability that Aronson and others had conspired to defraud investors regarding the promissory notes that had been issued. I also had access to ample information by which I could have determined whether or not the promissory notes had been issued as part of a securities fraud conspiracy . . . and I recognize by allowing Aronson to deposit corporate funds into my attorney escrow account so that the companies could continue to operate in the event of a freeze order, there was a high probability that I was furthering an exit strategy on the part of Eric Aronson and others, and that my actions were helpful in helping Aronson and others avoid repercussions, including criminal repercussions, for a conspiracy in which they had engaged. . . . I recognize and admit that my actions make me an accessory after the fact to a securities fraud conspiracy that involved Eric Aronson and others. I fully accept responsibility for my actions and the consequences of those actions.'"
In determining that a prison sentence was necessary and that a period of incarceration of 14 months was the appropriate term, Judge Spatt found that the respondent had committed a "very serious offense" and that he had "grossly violated [the rules governing escrow accounts] in the most outrageous fashion." In mitigation, Judge Spatt noted that the respondent "has no criminal history" and "has not [previously] been in trouble," and that "[h]e was a practicing lawyer[,] which I hold in the highest esteem."
Related Civil Proceedings 
The Securities and Exchange Commission (hereinafter SEC) commenced civil proceedings against the respondent in connection with the same fraud, which resulted in a judgment, on consent, entered December 23, 2013. The SEC judgment (1) permanently enjoined the respondent from violations of section 10(b) of the Securities Exchange Act of 1934 (hereinafter the Exchange Act), 15 USC § 78j(b), and 17 CFR § 240.10b-5; (2) permanently enjoined the respondent from aiding and abetting any violation of section 13(a) of the Exchange Act, 15 USC § 78m(a), and 17 CFR § 240.12b-20 and 17 CFR § 240.13a-11 thereunder; (3) prohibited the respondent, for five years from entry of the judgment, from acting as an officer or director of any issuer that has a class of securities registered pursuant to section 12 of the Exchange Act, 15 USC § 78l, or that is required to file reports pursuant to section 15(d) of the Exchange Act; and (4) barred the respondent, for five years from entry of the judgment, from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.
On January 28, 2014, the SEC initiated administrative proceedings, pursuant to Rule 102(e) of the SEC rules of practice, to suspend the respondent from appearing and practicing before the SEC as a result of the aforementioned judgment. A settlement was reached whereby the respondent agreed to be suspended from appearing and practicing before the SEC for a period of five years from the date of the order.
Special Referee's Report 
In a report dated July 18, 2017, the Special Referee noted the following mitigation:
"Respondent's arrest occurred more than five years ago. He has not shirked the responsibility for his present situation and acknowledges that he made a terrible mistake in permitting his escrow account to be improperly utilized by a third party. He is aware of how serious a mistake it was and is genuinely remorseful.
"No client was disadvantaged by respondent's conduct relative to the escrow. Nor did respondent personally gain in any manner from the misdeeds of the principals of Permapave or from the misuse of his escrow account.
* * *
"In the five years since his arrest respondent continued to practice law. He has done so with no claim by any client or adversary that he has been less than a zealous advocate. He has not received any additional charge or claim against him in that period.
"Other factors to be considered in mitigation are respondent's unblemished record before this incident, his expression of extreme remorse and the numerous letters submitted on his behalf attesting to his good character and to the aberrational nature of the misconduct. He is unlikely to repeat this conduct so he is not considered to be a danger to society.
"Respondent has used his legal expertise for good purposes over the years by assisting several not-for-profit groups to achieve 501(c)(3) status and to otherwise provide contractual and business support.
"He and his family have struggled during the past five years to get past these events and to move on with their lives. He was genuinely concerned about how they would manage during his term of incarceration. Whether the term of imprisonment and the subsequent supervision will be considered sufficient punishment for respondent, is a matter for this Court to determine."
Sanction 
The Grievance Committee for the Tenth Judicial District and the respondent each move to confirm the report of the Special Referee. The Grievance Committee contends that a severe sanction is warranted in light of the gravity of the offense, whereas the respondent asks for the imposition a lenient sanction, namely, a suspension that is "no more than coterminous with [his] criminal incarceration" of 14 months.
In determining the appropriate sanction, this Court notes the following mitigating factors: the respondent's unblemished disciplinary history, the aberrational nature of the misconduct, the respondent's remorse, the high regard in which the respondent is held in the community as shown in the numerous letters submitted to the sentencing court, the respondent's pro bono activities, and his cooperation with the criminal and disciplinary authorities.
Notwithstanding the Special Referee's failure to mention any aggravating factors in her report, this Court notes the following aggravating factors: the respondent knowingly used his escrow account to shield funds from creditors, the respondent knowingly frustrated the judicial process when he agreed to use his escrow account to circumvent a freeze of Permapave's bank accounts, the respondent minimized his culpability by denying knowledge of the fraud; and the respondent was an experienced attorney whose career included one year of full-time employment with the SEC. Moreover, contrary to the Special Referee's findings, we find that individuals were harmed, namely, the investors who were defrauded. In covering up the fraudulent scheme, the respondent perpetuated the harm. While the respondent did not use the funds deposited into his escrow account for personal gain, he was paid a lucrative retainer fee of $10,000 per month for his services.
Under the totality of the circumstances, we conclude that the respondent's criminal conduct warrants a suspension from the practice of law for a period of four years.
MASTRO, J.P., RIVERA, DILLON, LEVENTHAL and MILLER, JJ., concur.
ORDERED that the motions to confirm the Special Referee's report are granted; and it is further,
ORDERED that the respondent, Fredric H. Aaron, admitted as Fredric Harlan Aaron, is suspended from the practice of law for a period of four years, effective immediately, without credit for the time elapsed under the immediate suspension imposed by order to show cause of this Court dated April 25, 2017, and continuing until further order of this Court. The respondent shall not apply for reinstatement earlier than September 21, 2021. In such application (see 22 NYCRR 691.11, 1240.16), the respondent shall furnish satisfactory proof that during that period he (1) refrained from practicing or attempting to practice law, (2) fully complied with this order and with the terms and provisions of the rules governing the conduct of disbarred or suspended attorneys (see 22 NYCRR 1240.15), (3) complied with the applicable continuing legal education requirements of 22 NYCRR 691.11, and (4) otherwise properly conducted himself; and it is further,
ORDERED that the respondent, Fredric H. Aaron, admitted as Fredric Harlan Aaron, shall comply with the rules governing the conduct of disbarred or suspended attorneys (see 22 NYCRR 1240.15); and it is further,
ORDERED that pursuant to Judiciary Law § 90, during the period of suspension and until further order of this Court, the respondent, Fredric H. Aaron, admitted as Fredric Harlan Aaron, shall desist and refrain from (1) practicing law in any form, either as principal or agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, Judge, Justice, board, commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law; and it is further,
ORDERED that if the respondent, Fredric H. Aaron, admitted as Fredric Harlan Aaron, has been issued a secure pass by the Office of Court Administration, it shall be returned forthwith to the issuing agency, and the respondent shall certify to the same in his affidavit of compliance pursuant to 22 NYCRR 1240.15(f).
ENTER:
Aprilanne Agostino
Clerk of the Court